Mr. Tini, may I proceed? Well, good afternoon, Judge Gregory, and may it please the Court. My name is Derek Tini, and I represent the petitioners on this petition for review of North Carolina's Clean Water Act Section 401 certification for Mountain Valley Pipeline's Southgate Extension Project. We are here on petitioners' motion for stay pending review, which was filed after Mountain Valley accelerated its construction schedule in late January of this year. A stay is necessary to prevent MVP from completing all of the stream crossings authorized by this permit before the case is resolved on the merits. Petitioners request a stay because they can satisfy all four of the McKinnon factors. On the merits, there are two flaws. First, this Court has already held in Sierra Club v. West Virginia Department of Environmental Protection that an agency acts arbitrarily and capriciously when it predicts compliance without explaining why the same measures that failed before will work this time. North Carolina DEQ made exactly that error here. It's the same company, the same construction method, the same assurances, and the same lack of explanation. The second merits flaw is that DEQ compounded its error by failing to make compliance with certain measures it relied on express conditions of the certification. Instead, it insists that Mountain Valley Pipeline's entire application package was somehow incorporated by reference into the permit, including MVP's promises to contribute to a reduction of Duke Energy's carbon emissions and to generate millions in tax revenue, both of which would be absurd There has been no construction in North Carolina, correct? I believe that to be the case. It's my understanding. Okay, well then how could there be a record of noncompliance in North Carolina? You are correct, Your Honor, that the record of noncompliance is not in North Carolina. The record of noncompliance is in West Virginia and Virginia. But I would submit that my West Virginia driver's record would be of relevance to the North Carolina DMV if I were to apply for a license there. The same construction methods, the same construction measures, and in fact, the Piedmont region of North Carolina is very similar, if not identical, to the Piedmont region of Virginia where many of these violations occurred. The last 55 miles of main line were in the Piedmont region of Virginia after it crossed through the Blue Bay County. And so if you look at their record... And why aren't the reasons given by North Carolina DEQ sufficient here? In the record, North Carolina DEQ offered five reasons, well, six total reasons, five of which were procedural, one of which was substantive and was just a plain error. But all of those measures that they offered were implemented by Mountain Valley Pipeline during its main line construction. And so in that way, those measures were similar to the repackaged measures that were found insufficient by this court in the West Virginia Department of Environmental Protection case. The idea is if you are committing to do the same things, but those things prevented the violations last time, you need to have an explanation of why things will be different this time. And that is utterly lacking from North Carolina's explanation of its issuance. You posit this as though this is the same project as what we addressed, I guess, earlier in the Sierra Club decision in West Virginia. And you say same parties, that sort of thing, but there are a lot of differences. I mean, you're talking about different states, different water standards, different mechanisms, a different project, not the least of which is when we... As I recall in the earlier case, it seems to me the big difference was it was the same case. And after it had gone through a lot of iterations, it came back and said, well, you've done this before, you've done this before. And therefore, maybe a question of credibility of whether or not you would do it was there. But this is a totally different situation. What's the relevance here in this case? Respectfully, Your Honor, I don't think the differences are quite as profound as you might think. Well, when I say it's a different state, that's a difference. That absolutely is a difference. When I say that the water standards are somewhat different, that's a difference. Only minimally. And let me explain why. And it's a different project. I mean, the earlier one was a massive project. I mean, as I recall, I mean, it's the beginning of things. So this is sort of morphed in something different, maybe some kind of a spur or something else that's there. But isn't this... I mean, it seems like it's different to me. And even so, wasn't that considered? It's not evident from the record that North Carolina presented that it considered the differences with North Carolina. The very differences that you've identified, I'd like to explain why they're not quite accurate, but North Carolina did not engage with those. You are correct, there is a state line. But the geographic line doesn't make a difference between the Piedmont region that Mountain Valley Pipeline mainline crossed and the Piedmont region in North Carolina. EPA recognizes them as the same ecotype. And that is why regionally and geomorphologically they are the same, even if they are different sovereigns. And the water quality standards that are at issue are virtually identical. These are the narrative standards that prohibit sedimentation and turbidity. We aren't talking about a question of, well, North Carolina restricts PCBs to X number and Virginia restricts them to Y. This is the same narrative standard involving the same pollutants, sediment and turbidity, which were the problem on the mainline. So yes, it is a separate project. It is shorter than the mainline is. That is undeniable. But it is the same company implementing this. Did North Carolina address any of the issues that Judge Wynn just brought up in its rationale? Not in its rationale. In its rationale, which exists in the hearing officer's report, which was one of the exhibits to our motion, the hearing officer addresses comments. The hearing officer recognizes that there were comments about Mountain Valley Pipeline's compliance history and the vast magnitude of the violations that occurred during mainline construction. All the hearing officer offered in response to that were assurances that Mountain Valley Pipeline was going to do five things on Southgate. It was going to have inspectors, which if you recall from the West Virginia case, was something that was present on mainline. They were going to have pre-construction meetings. Again, that was going to occur on mainline. The other three are, I'm happy to dive into them if, the point is all five of the procedural measures they offered can be found as requirements for mainline. And so to the extent he's offering an explanation, the explanation he offers doesn't explain what's going on. One of them was that MVP self-report non-compliance. That is correct. MVP was already required to do that under the West Virginia oil and gas permit, which provided that they had a duty to mitigate the impacts of their construction and that they report violations. If you combine those two, if they did have knowledge beforehand that a violation was going to occur, that would be subsumed by the duty to mitigate under the oil and gas permit. Can you address your second argument since your time is... Is waning, certainly. Waning, yes. Yeah. The second argument also follows on this court's holding in West Virginia Department of Environmental Quality. And this one doesn't turn on the differences in state or in construction. This is a matter of law that the section 401 requires, as this court held in the North Carolina Department of Environmental Quality case versus FERC and in West Virginia Department of Environmental Protection, 401 requires when a state concludes that some action is necessary to assure compliance with water quality standards, it has to be included as a condition of the 401 certificate. And in this case there are... And why isn't condition three sufficient for that? Condition three, if I recall correctly, that's the one that requires them to obtain an approved plan. Yeah, to secure an approved stormwater management plan. And the reason is it does not require them to comply. Words have meaning, especially when it comes to the section 401 certificate and its interplay with the Natural Gas Act. Remember that the Natural Gas Act preempts any state law or any state regulation of the pipeline that does not come from the Clean Air Act, the Coastal Zone Management Act, or the Clean Water Act. These stormwater provisions that North Carolina insisted could assure it that there would be compliance with water quality requirements are creatures of state law. They are not part of the Federal Clean Water Act program. And so thus they are preempted. So the enforcement provisions that North Carolina would ordinarily use to enforce a stormwater plan that's obtained are preempted by the Natural Gas Act. And that's 15 U.S.C. 717 B subparagraph D. But there were two other conditions that also should have been included. One, the hearing officer offered that North Carolina could be assured of compliance with water quality standards because Mountain Valley would use methods applicable to areas with high quality waters despite the fact that there weren't such waters in Mountain Valley's pipeline. What about condition two, this incorporation of the plans and specifications? Certainly, Your Honor. The incorporation, by reference, is a litigation position that simply can't bear the weight that they would put on it. First of all, plans and specifications is a term of art, as the Supreme Court has recognized since 1918 in the Spearing case, that applies to engineering designs. What that condition does is it approves the project, the what and the where. What it doesn't approve is the how. The plans and specifications don't include the environmental compliance. Should condition two be interpreted rather broadly here, or do you see a very narrow interpretation of it? I think it has to be interpreted narrowly for two reasons. First of all, if it were interpreted as broadly as the state and MVP offer, it would stand to, it would render redundant other conditions of the permit that specifically let... I understand that. I don't want to cut you off on that. That seems like to me, I mean, we have to remember where we are. We're at a preliminary stage. There's a merits coming along. Do you really want to argue that against this being a broad interpretation, if they're willing to agree that there's a broad interpretation? I mean, wouldn't you prefer that MVP be bound by more conditions? I mean, you're here making an argument and I'm wondering if when you show back up, you're going to jump on the other side of this possibly and says, this should be broadly interpreted, you know, so that they have these conditions. But here you're saying, no, it does not have it. I'm wondering, you know, does that, how does that fit in your argument? Certainly. I may be accused of a lot of things, but I hope I'm never accused of being inconsistent on my positions. I will not come back and try to argue that that should be interpreted broadly. And I know that, you know, the art of war tells us we should not interrupt our opponents when they're in the process of making a mistake, which I think Mountain Valley Pipeline is, but it seems to me as though they're willing to admit that it can be interpreted broadly. Well, you know, maybe this is a case where we lose the battle but win the war. I don't know because if I don't know what battle you're winning and losing by, by saying, you know, this provision does not comply with it. If, uh, if in fact they're willing to say, yeah, those extra things that you say, we are bound to do those things. Your honor, the application is not limited to those things. There are dozens of affirmative commitments and use of the word will to describe what the project would do. And I don't know what the limiting principle would be to determine which of those affirmative statements that Mountain Valley made in its application are enforceable under the Clean Water Act and which are not. For example, um, they say that their project will pay approximately $1.5 million in ad valorem tax revenues annually on average. Is that enforceable through the Clean Water Act? It certainly shouldn't be. Let me come at a different angle on this. And that is because we're dealing again with preliminary stage. You didn't make this argument in your initial motion. You did so in reply. Normally, that's not something that we allow because you don't get a chance to respond on the other side of it. And, you know, given that procedure posture of it, I mean, why? Why should we even consider this at all? We raise it in reply because it was only raised in response. We had no idea that they were going to offer this broad interpretation of the term plans and specifications to incorporate it. I see that I'm out of time. May I conclude my response? You may. Thank you. We offered our affirmative case in our motion. They said these things were necessary. They're not conditions of the permit. They looked at their permit, realized they weren't conditions, constructed an argument that everything in the application was incorporated by reference, and we replied to that in our brief. I think that this argument is appropriately before the court, respectfully. With that, we respectfully request that the court grant the motion to stay. Thank you, Mr. Tini. Mr. Crabtree. Good afternoon, your honors. May it please the court. Special Deputy Attorney General Taylor Crabtree from the North Carolina Department of Justice on behalf of the respondents, the North Carolina Department of Environmental Quality, Secretary Reed Wilson, and Director Richard E. Rogers. Respondents opposed the motion to stay. The North Carolina Department of Environmental Quality is no rubber stamp for pipeline approvals. I stood before this very same court five years ago defending a denial of 401 certification requests from this very same company. It may not be, but you have to be mindful of the next case coming up. If you look what Virginia did and what North Carolina did, it's a lot cursory to me compared to the kind of responsiveness that was given by the agency there. And I'm sure you're familiar with it because, like I said, it's the next case coming up. And I'm not saying it's not sufficient. I'm just saying if there's a case where it looks like it's a little cursory, there were a lot of things that were sort of left out here that quite likely should have been put in, I think. Yes, Your Honor, I can speak to that. I think Virginia is in a very different posture, as Your Honor identified with your discussion with my friend on the other side earlier in the call inquiry. Virginia has had MVP. It had its own record of noncompliance, its own record of noncompliance with Virginia's program, with certification. And I don't think those are necessarily distinguishing facts that need to be in the hearing officer's report, but I do think it speaks to the degree of explanation that should be expected and should be required when an agency has... North Carolina was aware of the degree, the history of noncompliance of this company in this pipeline, correct? Yes, Your Honor, we were aware as the hearing officer. So, where is the explanation for why things will be different this time just because it's in North Carolina? I think North Carolina is entitled to rely on its own experience in implementing the 401 program and using its 401 program to protect its water quality standards. And this is not the first... So, you're saying, is one of the five reasons that North Carolina says that will ensure compliance this time is North Carolina's strong enforcement program. Is that what you're speaking to now? That's one aspect of it, certainly, Your Honor. There's also, I think there are... And all the others seem to me, or most of the others seem to me to be basically because the company says so, because they pinky promise they won't do it again. That's what it feels like. Respectfully, Your Honor, I don't think that's fair. I think if you look at this case and compare it to the certification that this court considered in West Virginia, there are at least three very notable differences between that case and this one. And I think first among those, and I think probably most importantly, is North Carolina relied on two things principally to address, to say why this pipeline won't cause violations of water quality standards. And that's its erosion and sediment control program, both during construction and after. And unlike in West Virginia, where this court held that those condition that the oil and gas permit that the HC was relying on in that case was not a condition of the 401 and was therefore potentially preempted. We have an express condition, condition 10, that incorporates the entirety of the Sediment Act in North Carolina. That is a robust regulatory structure to address precisely the kinds of construction stormwater impacts that we're talking about here. That's not present in West Virginia, and it's a big distinction here. And where is that explanation present in the rationale provided by North Carolina? Yes, Your Honor. It's on page five. Starting on page five and continuing into page six of the hearing officers report, which is exhibit two to our response. So it's in the context of, remember that this question about compliance history is not itself a separate requirement of any statute or regulation. It's about whether the project can be expected to comply with water quality standards. And you said there were three important differences, and that was your first one. I'm interested in the other two as well. Yes, Your Honor. So we have the first one, which I think is the most important, which is condition 10, which is the incorporation of these other regulatory regimes. We have something that's already been addressed at some length today, which is the the fact that NVP committed to over-engineering the project to comply with North Carolina's rules and regulations. Okay. So that's where I said earlier that because the company says so. No, Your Honor. Not just because the company says so. Because the company said so and condition two requires them to live up to that commitment. And respectfully, that is not a litigation position. My client, we include condition two, incorporating by reference the plans and specifications of projects in the 401 program in every 401 certification that we issue. And we rely on that condition all the time. Our inspectors and our staff rely on that condition to avoid having to regurgitate applications that can run into the hundreds of pages to make sure applicants do what they say they're going to do. It makes perfect sense. This is what the applicant is asking us to certify, which is, hey, if we do what we say we're going to do, what addition will that violate water quality standards? And what we do in a 401 certification is we say, yes, but do these things too. So we have this condition to require them to comply with what they say they're going to do. And the superfluity canon that my friends point to in their brief is it just can't bear the weight that they place on it. I think their interpretation of the condition would render condition two superfluous. That's just not sufficient. And as Judge Wynn pointed out and Judge Rickery pointed out, this, we now have, if you were worried about it at all, we have now the regulated party to their detriment coming to this court in writing in their briefs before this court, and I anticipated argument as well, and saying we are bound by what we said. And why shouldn't we take them at their word? This is not... Because of the history of noncompliance. Well, I don't think that changes whether they're bound. You know, you don't have to... And I'm sorry, I think I interrupted Judge Wynn and you as well, Mr. Crabtree. No, I'm sorry. Judge Wynn. Yeah, my, well, I see where you're going with this in terms of, and particularly with the long this has been going on, and it may have gone on maybe 100 pages or so, it seems to me it would have been cleaner just to put those conditions in the certification itself, particularly in a case like this, whether than seeking to incorporate them. But if I understand you correctly, this is more or less like a concession or at least an admission that whatever it is the other side is in terms of whether you are bound, you are now establishing, I would say, at least to the point of there being a good case for estoppel, yourself has admitted that these are conditions you're bound and would bind the MPP by. Is that correct? Yes, yes, Your Honor. Certainly, I think that there is a strong argument for estoppel here. I don't even think you need to get there, though. But we don't need a strong argument for estoppel if I'm getting a concession straight up from you right now. That's exactly what it says. Yes, Your Honor, sure. Maybe we call it estoppel, but it seems to be pretty strong to me if you get a party on the other side and one is saying that it doesn't mean something. You said, yes, it does, and you're telling the court now, and this is the same case, albeit in a different procedural place. And that's why I asked your colleague on the side, is he going to come back to this court arguing something different when it comes up? Because it looks like to me it'll be in a different posture, and that's what he's going to want. He's going to want a broad interpretation of it at that point in time, I would think. But just to be clear on that point, because I think that's a very good situation to be in now, particularly given since he only raised this in a reply. So, I mean, the court very well could just say, okay, we won't deal with it until we get to the merits on it. But there's a reason to deal with it. Now, if this is very clear at this stage, we don't need to come back and relitigate or get into questions of what does it mean if that is the posture that's being represented and understood here today. Yes, Your Honor, I think that's a great point. Let's just play that hypothetical out. If we did, you know, Judge Thacker, your point, if MVP did, and I don't have any reason to believe that they won't, but if they did not live up to these commitments down the road, and my office sought to enforce those as we would, they would be hard-pressed to argue now that they're not bound by these commitments. Well, the question will go to the MVP representative next. Yes, Your Honor. We got the one side in terms of you and whether you're going to make sure they're bound by it, but they need to make sure it is understood what you are saying they understand it to be the case, too. So, yeah, yeah, we're not going to leave that stone unturned. And I don't know what, I think it would be, I don't, I think it'd be more than disrespectful. I think it would be something else to make that representation today and then come back and say totally different in a marriage type situation. Mr. Crabtree, you describe your certifications being a strong enforcement program. Does that mean that you're going to take efforts to punish them after they, if they violate, after they violate it, or it means that you're going to do something special to make sure they don't violate it at all? Which is it that makes it a strong enforcement? I think it's both, Your Honor, both ends. So we have on the, on the proactive, on the, on the prospective side, the Sediment Act that I've referenced, it requires, and I see my time has expired. If I can just briefly conclude, I'm happy to, or I can stop. Oh, you can. Thank you, Your Honor. So on the, on the prospective side, we have a robust program through the Sediment Act that requires the company to submit very detailed plans of just how they are going to construct the project in a way that protects water quality standards. If you look at the engineering specifications, they're, they're very, very detailed. So that's, that's on the presidentative side. And then on the enforcement side, we do take action when things aren't complied with. And so that, those, it's, it's a both end approach. And Your Honor, I think based on the arguments made today, I think we, we would contend that the stay motion should be denied primarily because we don't see that they've, they've made their showing of a likely success on the merits. Thank you, Your Honor. All right. Thank you. Mr. Marwell. Thank you, Your Honor. Good afternoon. Jeremy Marwell for the respondent intervenors, including Mountain Valley Pipeline, and may it please the court. If, if possible, I'd like to start with the question of what the certification requires, the enforceable conditions, since that was teed up. Two points on that. And then I'd like to speak to the adequacy of the agency's explanation with regard to the history of noncompliance. And if I get to it, one brief sentence on the other state factors at the very end, the three other factors, we'll see where we get. I know we thought start where we left off and go right to what you just heard your colleague represent and get that off of the table one way or the other. I don't, I'm not backing you in to admit one thing or another, but, but I want to know the position of MVP insofar as what's being represented by the state agency, particularly regarding condition two. And, and what, and how do you see that broadly in the manner they say, and also whether you are bound by those conditions that may not be so explicit in the certification, but, but, but at least the state seems to think they are. And I want to make sure that the two of you are agreeing on that and where we are. We are in vigorous agreement with the state that we are obliged, we are bound to comply with those conditions. And I'm trying to be as clear as I can. We think that flows from the plain language of the conditions, but also if you have any concern, condition two, which incorporates the other conditions by reference on condition three, I mean, the petitioner's lead argument is about the stormwater concern, the requirement to secure an approved stormwater plan, I think is naturally understood to require us to comply with that plan. I mean, if, if my child said, I want to have my friends over for a party on Saturday and I said, okay, but you got to tell me your plan and get my approval before you do any of that. I think most natural English speakers would understand that he has to comply with the plan and the notion of the parties, um, understandings of a permit being relevant to you, uh, goes to this, uh, question of interpreting a permit like a contract. This is the Ohio Valley case that is cited in the briefs. Uh, you do have a case. What's the rationale for saying that just because someone says they're going to comply with the plan, they actually will a particularly given the history of noncompliance. That's the concern, at least for me. I understand your honor. One thing that may be helpful is that immediately after that condition, the agency cited to a portion of its administrative code, which speaks to enforcement. Uh, and the whole premise, I think of what we're discussing is that the certification is enforceable, right? That's why it exists to make sure that enforcement, um, can occur, uh, in this Virginia electric and power case, nine Oh three F third at four Oh three. That's a decision of this court. Uh, the court cited the restatement and said, in the context of a clean water permit, what you're trying to give effect to is the shared intent of the parties. And here the parties are us, uh, and, and the state. So I think the concept of why our view matters is, is, is consistent with your, with your precedent. Um, I also would like to step back. Um, and when you're thinking about the principles in writing an opinion about how to interpret the statute, on the one hand, the petitioners are saying every important material element to the state needs an enforceable condition. Okay, fine. On the other hand, they're saying you should apply an anti-redundancy cannon to narrowly construe provisions in the certification that might otherwise avoid the existence of a gap. And I, I don't think that's a sensible way to interpret a document that has a, uh, intention of providing protection for water quality. Um, if you are nervous about the incorporation by reference, uh, and I, I don't know that you should be, um, the, I think it has a basis in the text. Um, also remember that condition 10, um, see that we've lost Mr. Tini. Yeah. Did I stop? I apologize. I had to plug in my laptop. I terribly, I apologize. That's fine. I stopped as soon as I saw you. So you didn't miss anything. May I continue? Yes, you may. Uh, so condition 10, which, uh, explicitly incorporates the sediment act, which is the statute that Mr. Crabtree was speaking to earlier requires us to obtain an approved, uh, erosion and sediment control plan. This came up in the petitioner's reply brief. One thing you saw in the reply brief is that the high quality water, uh, elements are part of that plan. The other thing that you didn't see in the reply brief is that our coordination with the other pipeline in the area is also part of that approved plan. That's at, uh, item 19, page eight of our erosion and sediment control plan, which is linked in the petitioner's reply. So that is an enforceable express condition that requires us to do those things as an additional sort of belt and suspenders approach. If you, if you have concern about the incorporation through condition two, if I might speak to the, um, the adequacy of the agency's explanation, unless there are other questions on the enforceable condition, Judge Wynn, I hope I have satisfied, uh, uh, your questions about the, uh, Mountain Valley's position on those issues. You seem to have been very vigorous in the way you give it. And, you know, we hear back when we come back, we get all kind of nuances, interpretations from lawyers. I did the best I could, and I think you did too. I understand. It seems to me as though you're saying you're clearly bound by it. This was as close to a concession as I think could be make unless somebody else sees it differently. Um, as to, thank you, Your Honor, as to the record of enforcement issues on the main line, um, and the adequacy of the agency's explanation, just a few points. First, we take the issues that arose early in the main line very seriously. We have worked hard to improve the practices and, and avoid those issues. I hope you, we will explore that more in the, in the next case that comes where there's a more fulsome record that compares Virginia's, uh, history to Virginia's certification. Um, with regard to the question of why it is going to be different this time, I'd like to answer that, but also urge you, I don't read this court's decision in West Virginia as saying that is the only way for a state to give a reasoned explanation when faced with a record of noncompliance. A state could also, I think, reasonably differentiate between the and say, this is a different project. I mean, remember in North Carolina, this is five miles of, of pipeline that is, uh, much, much smaller in objective and relative terms than the main line. Um, I, I would urge the court to look not only to the section of the hearing officer's report that directly acknowledged and addressed the concern raised by petitioners about compliance, but also the section that Mr. Crabtree referred to, which is a few pages earlier in the decision document that talked about why the state had confidence that the project would not violate water quality standards. That is, I don't think you can, that is all part of the same discussion. Um, obviously enforcement... Well, did the comments indicate that that was part of the same discussion? Did the commentary in response to the noncompliance issue say, oh yeah, and also you should look back at the pages prior. We, we're relying on that too. So, um, the way that the document is, is, is structured, it, um, identifies the comments in bullet points and then response to the comments. And so in that section on page five, among the other things that the hearing officer was referring to and responding to, was it concerned that the proposed activity will not comply with state water quality standards and various specific things that they will cause turbidity, sediment erosion, storm events, excessive sedimentation. I'm sorry, I see my time is up. So then the answer to my question about whether the response on the history of noncompliance referred back to that prior page five, the answer is no. Um, you have to look at page five and then, and then you're saying that somewhere in there, it talks about the history of noncompliance, but the specific comments in response to the page five. And we know that North Carolina knows how to incorporate things by reference and they didn't do that there. Correct? Yes. May I respond? Sorry. Yes, you may. Over my time, but may I? Yes. Yes. I think that's correct, Judge Thacker. I, I should say, I don't view the, the Chenery doctrine, uh, that the court needs to look to contemporaneous explanations given by the agency. In other words, not litigation positions, but positions at the stringent edge to it that you would ignore a section of the agency's contemporaneous decision document. Um, that, uh, that, that seems on point. You know, the question is about what are we going to do and is it going to be effective? I understand your argument. I just wanted to get a specific answer to my question and then you could have made your argument and I understand your argument completely. I understand. I'm sorry if I wasn't directly enough responsive. Um, I may make one final point, your honor. Yes, you may. Uh, just on the other three state factors, which haven't gotten a lot of airtime, this project is, um, being developed in response to demonstrated need by two utilities in North Carolina that are responding to urgent growth in energy demand. We are not building this on spec. We are building it to a timeline that the utilities need. And there are real, real consequences, uh, to the public, to the energy consuming public of delaying a project coming online. Among other things, we are trying to provide gas to help Duke to retire coal fire power plants and replace it with cleaner burning gas fire power plants. So, uh, I would urge you as you think about the factors to weigh that public interest harm to non, non-moving parties as part of the capital. It would be real difficult to, to get into that realm of it. I think sticking with the first factor is a good thing. I mean, the environmental concern, whether it's contemporary or future is in every instance. Uh, and when we approach it from that economic and that benefit approach, uh, it gets into a very fuzzy area and it might sound good today, but for many, and you talked about the public's interest, it reaches deeply into our environment and what it means. So it's, there's a real argument that's being made here. It's not just being made for the sake of just irritating one. And you have a good point. Uh, but I think it, it has to be balanced with that. I understand. Judge Gregory, may I respond to Judge Nguyen's, uh, question? Well, I'm not, well, one thing I think that maybe, maybe, maybe, maybe Mr. Marlowe, you open up a can of worms and maybe your one comment too much, because while you said, we look to the future and all of us do in terms of the benefit of us, then also the corollary that we also look to the past in terms of what we have to do, perhaps to prevent the same thing from happening. And maybe in Virginia and West Virginia too. So when you do that, when you, when you pick up that coin, you got to realize another side of it too. And that is the question that in Ohio case, it says, just saying, I will send no more. And I have realized you send before that's all you do is not enough. So that's the real question is, have they, has North Carolina done enough to make sure, to assure that this is truly a strong, a new and strong enforcement question? And I don't think anybody disputes the efficacies of energy and public good, but that's why these things are protected environment that we'll have to live with for hopefully eons and eons in times as earthlings, not separated just by states or countries or continents. All right. I think with that, we'll let Mr. Tini have the last word. Thank you, Your Honor. Thank you, Judge Gregory. I'd like to visit the question of contract interpretation because we, we completely agree with, with North Carolina and with MVP that the permit should be interpreted like a contract. That's what the Ohio Valley Environmental Coalition versus FOLA case holds. And both Virginia and North Carolina apply the four corners rule to contract interpretation. And what MVP and North Carolina are inviting you to do is to consider evidence of their intent beyond what was put on the pages of the paper. And that is a dangerous precedent to set, given that this is a unique circumstance where the question of what the contract means is coming up outside of the enforcement context. I think that's a good, that's an interesting way to approach this, but I don't want to get confused. This is not a contract case. I mean, our view is not a de novo case. We're not looking in terms of interpreting provisions here. This is a case that's dealing with arbitrary and capriciousness on the part of an agency that factually, we're in the factual realm of giving deference to. And so that's, I think that's a different type of case. And I got your analogy to the contract thing sounded interesting, but I don't want to get confused on it. It may be like a contract, but the, but our review is of the agency's decision. And the issue is whether it was arbitrary and capricious in making a decision and in which it itself has some measure of expertise on it. It's not a, it's not a Chevron type case at all. And from my perspective, it's a, you know, it's one in which you do that. That's been preserved by the Supreme Court that we review these cases from the agency because rightfully it does have a expertise that, that we don't have. I mean, I can talk this stuff with you, but at the end of the day, they got the expertise on it. And we, you know, so we, our job is really to determine where it would be arbitrary and capricious. And that's where it's helpful to us in your arguments. And you did a pretty good job sticking to the briefs to that, but maybe that's just the way I see it. But respectfully, your honor, I'd ask you to consider this, that the standard is not just arbitrary and capricious, but it's also otherwise in accordance with law. And I think a close look at the OVEC versus FOLA cold case stands for the proposition that the interpretation of a And that there's no contrary law in this circuit that holds that the permittees or agencies should receive deference on how they interpret a permit. Otherwise it would create chaos on understanding what's enforceable in a citizen suit and what is not. And so for that reason, that's why the court has held that it's interpreted like a contract that's consistent with the way the Ninth Circuit has interpreted it. I think if you were to analogize this, you said you don't have expertise. I beg to differ, but this is a strict question of law in this case, not a question of any expertise of what level of sediment will cause a water quality standard violation. This is a question of what words mean on paper. And so this does feel a lot like the Loper-Bright situation, or a lot like the, oh, is it Kaiser versus Wilkie that put the constraints on our deference, the interpretation of a regulation. The knee-jerk reaction to defer to an agency when the question is really one of law would set a precedent that is contrary to OVEC versus FOLA, quite frankly. Well, you need to help me on that. I thought this was primarily a factual case question. I mean, the question of whether, in fact, they complied with conditions they were bound by, the law seemed to be pretty settled on it. We've already established that, at least in prior cases here, what the law is on it. So I don't think we're in a statutory interpretation type case, which would be a Chevron or, as you say, Loper-Bright type situation that we would be dealing with. And I don't want to confuse this thing, because maybe you're kind of saying the same thing in a different way, but I want to make sure we stick to what the standard of our review is of this case. Absolutely, Your Honor. And this is an issue that's near and dear to my heart, and I have thought a lot about. So I'm not on the fly here, I assure you. While it may not be a question of statutory interpretation, it is a question of contract law. And interpretations of contracts are reviewed de novo. And so, therefore, the part of agency review that allows the court to examine questions of law de novo applies here. Yes, it's not the interpretation of a statute. Perhaps it's more analogous to the development of a regulation, which would... What is the legal question? What is the legal question? Are you saying that the question is whether the conditions were incorporated by reference? Is that your legal question? I see that I'm out of time. May I respond to the question? You may. Please. Thank you. The legal question is, what do the words on that paper mean? What does it mean to incorporate plans and specifications? Does it mean to incorporate the length, and the width, and the materials of the pipeline? Or does it mean to include every word that is in the application as a binding condition? That is a question of law, not one of fact, and there's no reason to defer to the agency, and especially not to the applicant. With that, we respectfully request that the court grant this motion for stay. Thank you, Ms. Tienen. Thank you, counsel, Mr. Caput, Mr. Marwell. Thank you for your arguments. We can't come down and shake your hands as we normally do in the Fourth Circuit, but know that this is a very hearty, virtual high-five. Thank you. We'll proceed to our next case.
judges: Roger L. Gregory, James Andrew Wynn, Stephanie D. Thacker